ABBIE S. LOWNDES ET ALS., ADMINISTRATORS, *vs.* THE CITY NATIONAL BANK OF SOUTH NORWALK.

Third Judicial District, New Haven, January Term, 1909.
BALDWIN, C. J., HALL, PRENTICE, THAYER and GAGER, Js.

The directors of a bank are bound to exercise a reasonable oversight and supervision of its officers and employees. If they neglect this duty and virtually place the entire management in the hands of the cashier, thus enabling him, by the use of the machinery and organization of the bank, to repeatedly misappropriate the funds of an estate of which he is administrator, the mere fact that they did not have actual knowledge of his fraudulent operations is of no avail in a suit by the estate against the bank to recover the sums so misappropriated. Negligent ignorance under such circumstances is as effective in law as actual knowledge.

One Layton, the cashier and managing officer of the defendant bank, was the financial director of a foundry company whose credit he was personally interested in supporting. He was also the administrator of an estate the funds of which he deposited in its

name in his bank, and which, by means of checks thereon payable to his order as cashier and indorsed by him as such, he used in taking up substantially worthless checks and notes of the foundry company which the teller, and the bookkeeper while acting temporarily as teller, had paid as they were presented at the bank, and had carried on the teller's blotter as cash items, pursuant to the orders of the cashier. This course of procedure was followed from time to time for more than a year until the funds of the estate had been largely depleted, and was taken with full knowledge by the teller and bookkeeper of all the facts. In a suit by the estate against the bank, to recover the funds so misappropriated, it was held:—

1. That such use of fiduciary funds was a fraud upon the estate enuring to the benefit of the bank, in which the bank by reason of the knowledge of its teller and bookkeeper participated, and therefore equity and good conscience would not permit the bank to retain the money so acquired as against the claim of the plaintiff.

2. That in sanctioning the plaintiff's recovery under such circumstances it was not necessary, at least in respect to certain items, to impute notice to the bank by reason of the knowledge of the cashier, nor to resort to any constructive knowledge on its part because of the negligence of the directors in their oversight of the affairs of the bank, as found by the trial court.

3. That in view of the culpable negligence of the directors who had virtually surrendered to the cashier the performance of their duties of supervision and oversight, by the reasonable exercise of which they would have acquired knowledge of his irregularities, the bank had become an active participant in the misappropriations of its cashier, and was therefore liable for the further amount of $5,000 of the funds of the estate, which the administrator drew on two checks payable to his own order as administrator, and which, having been indorsed by him as such, were given to the teller to take up two worthless notes of the foundry company which had been sent to the bank for collection.

4. That the bank was also liable, upon the same grounds, for a further sum of $13,000 which the administrator transferred from the funds of the estate into his own personal "special account," and afterward used to take up certified checks of his as cashier, the avails of which had been used in the interest of the foundry company.

5. That the knowledge of Layton in respect to another item of $10,000 —which he withdrew from the funds of the estate and deposited in another bank, receiving therefrom a certificate of deposit which he indorsed and deposited in his own bank to the credit of his "special account" and subsequently appropriated to his own uses—was his knowledge as cashier and therefore affected the bank and rendered it liable for that amount also.

Lowndes *v.* City National Bank.

6. That the bank was not liable for an item of $2,000 drawn by the administrator on a check payable to his own personal order, in the absence of any evidence that the sum so withdrawn was used for improper purposes; since such check was not irregular on its face and the bank was not bound to see that the money was rightly appropriated.

7. That interest was properly allowed from the date the deposit was demanded and its payment wrongfully refused.

While a bank is not obliged to supervise a trust account therein, or look to the appropriation of such funds when withdrawn, it may not actively and knowingly participate in their misappropriation. It may not become an active co-operating agency to that end and thereby directly contribute to the consummation of the wrong.

Argued January 26th—decided March 4th, 1909.

ACTION to recover an alleged balance of moneys deposited in the defendant bank, brought to and tried by the Superior Court in Fairfield County, *Roraback, J.;* facts found and judgment rendered for the plaintiffs for $43,661, and appeal by each party. *Error upon plaintiffs' appeal; no error upon defendant's appeal.*

*Clarence Lexow* of New York, and *James H. Webb,* for the plaintiffs.

*Edward D. Robbins* and *John H. Light,* for the defendant.

PRENTICE, J.  Jacob M. Layton, the cashier of the defendant and its principal executive and managing officer, was on March 31st, 1905, appointed and qualified as administrator of the estate of Theodore S. Lowndes, deceased, and continued to act in that capacity until his removal in June, 1906.  As such administrator he, on April 5th, 1905, opened a deposit account with the defendant on behalf of said estate and in the name of "Estate of Theodore S. Lowndes."  To this account he thereafter, at various times down to May 31st, 1906, deposited moneys of the estate to the amount of $122,858.75.  It is conceded that the checks of Layton, as administrator, against these deposits were properly honored to the amount of $64,858.75.

The balance of $58,000 the plaintiffs claim has never been properly accounted for by the defendant, and, having been demanded, is now sought to be recovered as money still due as a withheld deposit.

Upon the trial the defendant showed that the whole of this sum had been paid out, by transfers of account or otherwise, upon the checks of Layton, as administrator.

The plaintiffs, however, contend that the circumstances attending these several payments were such that the defendant was not justified in honoring the checks upon which they were made, and charging them to the deposit account of the estate. The circumstances, which in the main are not the subject of dispute, differ somewhat in respect to several classes of the payments. The court, as the result of these differences, held that the circumstances surrounding payments amounting to $39,842.36 were such that the plaintiffs were entitled to recover the amount thereof, and that those surrounding the remaining payments were such as justified the bank in paying them upon the checks presented. Both parties have appealed.

The facts disclose that the fiduciary character of the deposits in question was known to the defendant from the beginning. The account was in the name of the estate. Layton's relation to the estate was also known. He was known to be a stockholder in, and director and manager of the financial affairs of, the United States Foundry and Sales Company, and personally interested in supporting its credit. The directors provided for the active conduct of the bank, in addition to Layton, the cashier, a teller, and a bookkeeper, the latter of whom acted as teller a portion of each day. During a period of about two months prior to May 23d, 1905, the teller, and the bookkeeper when acting as teller, had paid all the checks and notes of the Foundry Company that were presented to the bank for payment, irrespective of whether or not that Company had sufficient funds on deposit to its credit with which to

meet them. Had the checks and notes thus paid been charged against the deposit account of the Company it would have been largely overdrawn. They were not so charged, but were carried as cash items, entered up as a part of the teller's cash, and kept in his drawer. On May 23d, 1905, a large number of checks and notes of said Company, so paid and amounting in the aggregate to $8,560.55, were being so carried as cash. Layton thereupon drew a check payable to himself as cashier for that sum, signed it "Estate of Theo. S. Lowndes, Jacob M. Layton, Adm.," indorsed it as cashier, delivered it to the teller and took out of the cash drawer the package of checks and notes therein. The action of the teller and bookkeeper involved in these transactions was taken in conformity with the orders and directions of the cashier, and they were each fully cognizant of all that was done. The same course of procedure was thereafter, by the direction of Layton and with the knowledge of his two associate officers, followed with the paper of said Company and, to a limited extent, with the paper of two individuals, until May 19th, 1906. During this time the checks and notes so paid, temporarily carried and finally from time to time taken up by Layton by eight checks drawn against the account of said estate, carried the total of their number up to about five hundred and the total of their amount to $26,842.86. These eight checks were in due course charged against the deposit account of the estate. The checks and notes which were taken up by them were at the time dishonored and of no substantial value. Upon presentment to the bank they had in part been paid in cash over the counter, and in part paid by credits upon the books to the correspondents forwarding them for collection. The latter were never charged back to the correspondents. At various times during this period, checks and notes of the Foundry Company which had been similarly paid by the bank upon presentation and were being similarly

carried as cash, were taken up by Layton by checks upon his personal account or upon the special account hereafter referred to, or with other funds of his own.

The effect of the several transactions thus briefly recited, if permitted, would be that upon the presentation and acceptance of Layton's checks upon the fiduciary funds on deposit in the defendant bank to the credit of his estate, there would result a transfer of the amount represented by them from those funds into the assets of the bank in substitution for dishonored checks and notes of an equal face value, which, with such rights of action as existed in favor of the bank by virtue of them or of the circumstances which surrounded them, were among its assets. It is of little importance how little or how much promise of return these rights of action held out. They could not be regarded as the legal equivalent of cash in hand. It does not help the situation to say, as the defendant contends, that in view of the manner in which the transactions were conducted and the dishonored checks and notes carried upon the teller's blotter, they were never owned by the bank, but by the teller, and simply represented a shortage in his cash. In this aspect of the matter the bank had only a right of action against the teller, and the money when received upon Layton's checks upon the estate's deposit wiped out the shortage and became substituted for the right of action against the teller—a result beneficial to the bank, surely. The trial court was quite right, therefore, in holding that these attempted transactions would result in a benefit to the bank and a corresponding injury to the estate whose funds were in its keeping, and in further holding that such being their character equity and good conscience would not permit them to be carried into effect so that the defendant could receive and retain the fruits of them. *Fairfield* v. *Southport National Bank*, 80 Conn. 92, 102, 67 Atl. 471; *Northrop* v. *Graves*, 19 Conn. 548, 555. The defendant had knowl-

edge of all that its teller and bookkeeper knew and that was all the facts of the situation. *Farmers & Citizens Bank* v. *Payne*, 25 Conn. 444, 450; *Platt* v. *Birmingham Axle Co.*, 41 id. 255, 264. It had this knowledge when these checks were presented by Layton. It knew that they were drawn upon a fiduciary deposit account. It knew that they were drawn in respect of matters which did not concern the estate whose funds formed that account. It knew that they were presented to take up dishonored paper which it had volunteered to pay and which appeared among its assets, or, as the defendant would say, to extinguish a right of action against its teller arising from official irregularities. It knew the benefit to it and the injury to the estate which would result from their acceptance. Its agents, through whom it acted, in fact knew all this. Its board of directors constructively knew it. The acceptance of the checks as authority for the transfer to the general assets of the bank from the deposit funds of the estate of the amount represented by them, and the attempt to carry that transfer into effect, was therefore to make it a partaker in the fruits of a known fraud, and that too, the fraud of its own agent. This the most elemental principles of the law forbid, and there is no need, in sustaining the action of the trial court in rendering a judgment covering these items, to resort to any imputation to the bank of knowledge by reason of such knowledge being possessed by Layton, or to any constructive knowledge on its part by reason of the negligence of the directors in their oversight of the affairs of the bank, which the court has found, or to the principle stated in *Fairfield* v. *Southport National Bank*, 80 Conn. 92, 103, 67 Atl. 471, that "when an agent . . . accepts on his principal's behalf money belonging to and fraudulently obtained from another with knowledge of the fraud, that principal, in treating this money as his own and retaining it as against the true owner, cannot claim as his own the act by which

the money was accepted, without also admitting as his own the knowledge with which the act was done," that "he cannot receive the benefit of the fraud and reject the resulting duty." *East Hartford* v. *American National Bank,* 49 Conn. 539, 553.

Two transactions, involving the use of checks drawn by Layton upon the estate's deposit in the same general course of conduct described, require separate attention. January 6th, 1906, after the practice already outlined had been persistently pursued for about eight months, a note of the Foundry Company for $3,000 was received by the bank for collection from one of its correspondents. The Company had no funds on deposit with which to pay it, and Layton thereupon drew a check upon the estate's account for the amount of the note, payable to his order as administrator, indorsed it as administrator, delivered it to the teller and received in return the note. The amount of the check was thereupon in due course charged to the account of the estate and credited to the correspondent. January 15th, 1906, a similar transaction was had with respect to a note for $2,000 similarly received. The court declined to permit a recovery of these amounts, upon the ground that it did not appear that the bank received any benefit from the transactions, and of this action the plaintiffs complain.

The principles applicable to the situation here presented are not those appealed to in determining the defendant's inability to charge the payments just discussed against the deposit account of the estate, but they lead to the same conclusion. We are now concerned with two incidents in the long course of a continuous dealing, and they are incidents which occurred after that course of dealing had long been in progress. This course of dealing had been marked by repeated irregularities on the part of the chief executive officer of the defendant in his conduct of the bank, and his repeated and continued wrongful conversion of funds on

deposit with it, in the accomplishment of which he had made use of the machinery and agencies of the bank under his control. This fact was, and for months had been, known to the other officers of the bank—the defendant's agents—and thus constructively to the directors and the bank itself. But that is not all, or the most significant fact. The directors had substantially surrendered to Layton the performance of their duties, and permitted him to conduct the affairs of the bank almost without interference, supervision or oversight on their part. They had created a practically one-man power, and lodged that power in him. He was thus enabled to carry on his fraudulent operations without their actual knowledge. By the exercise of ordinary diligence on their part they would have obtained knowledge of his irregularities. Such is the finding.

The law requires of directors the exercise of good faith and ordinary diligence and care in the performance of their duties. These duties include that of reasonable oversight and supervision. *Briggs* v. *Spaulding*, 141 U. S. 132, 11 Sup. Ct. Rep. 924. Where there is a duty of finding out and knowing, negligent ignorance has the same effect in law as actual knowledge. 1 Thomp. on Neg. (2d Ed.) § 8; *Fishkill Savings Institution* v. *National Bank*, 80 N. Y. 162, 168. "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to . . . exercise reasonable control and supervision of its officers. . . That which they ought, by proper diligence, to have known as to the general course of business in the bank, they must be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." *Martin* v. *Webb*, 110 U. S. 7, 15, 3 Sup. Ct. Rep. 428.

The situation thus presents this condition: The directors, with what in legal contemplation was knowledge of what Layton had been doing through the machinery of the

bank and with respect to funds intrusted to it, and being cognizant of their failure in the duty of oversight and control, continued him in his place of authority, continued to give him unrestrained authority, and continued their negligent failure to surround him with the safeguards of their oversight and supervision. He was thus furnished by the directors with the opportunity, the means and the authority, to continue his known irregularities and frauds upon the deposit in question, and to cause any additional frauds thereupon to be successfully consummated. That which was to have been expected—that which the directors must, therefore, be presumed to have anticipated—happened. Layton kept on abusing his office and his authority therein, and, by means of them through the machinery and organization of the bank, misappropriating the funds of that deposit.

The instances now in question were only two out of many. His acts in these transactions are in part, doubtless, to be regarded as those of Layton, the individual. Most of them may, for the purposes of this inquiry, be so regarded. In so far, however, as the use of the machinery and organization of the bank was involved, as it was at some point in all the transactions which are the subject of the present litigation, Layton, the cashier, cannot be eliminated. Upon all such occasions he appears upon the scene as a potent figure by reason of his authority to direct the action of the bank and that of his subordinates, and by reason of the influence and exercise of that authority. The two checks, when they were drawn, and indorsed, contained no direction as to the appropriation of the funds represented by them. That direction came from Layton when he passed them to the teller. The act of passing may be regarded as personal, and so in one aspect may the accompanying direction. But there remains the significant fact which cannot be overlooked, that there went with the direction to his subordinates, to give it force and effect,

the influence and authority of Layton's official position. Layton, the cashier, occupied the point of vantage. His direction reached over into the domain of the operations of the bank. It did not stop at the boundary line of his desires as a depositor. It carried with it a command to a subordinate to deal with the assets of the bank as indicated. When the checks were delivered to the teller with the accompanying direction, they passed into the machinery of the bank over which the cashier was master, and his direction involved one as to the use of that machinery, and it carried with it the authority of the master. When the teller proceeded to carry out his instructions and consummate the wrong, he did so by reason of the existence and exercise of the authority which was over him. The dominating factor of Layton, cashier, was thus present to guide and direct these delicate affairs through the channels of the bank, and to secure silence, acquiescence and an unquestioning devotion of its methods and instrumentalities to the doing of what was necessary to accomplish the end desired. The situation which made this possible was due to the culpable misconduct of the directors, to whom a large share of the responsibility for it attaches. It thus appears that the two transactions whose resulting loss it is now sought to impose upon the estate's deposit, involve as active factors in their accomplishment not only that of the active participation of Layton in his capacity as the managing officer of the bank, but also that of the misconduct of the directors charged with knowledge of what was going on, to which the presence of the first factor is directly traceable and for which it was directly responsible as stated. As the consequence, the bank stands in the position of being an active participant in the attempted misappropriation, so directly and to such an extent that the law will not permit it to consummate the wrong by protecting itself at the expense of the depositor. *National Bank of Oshkosh* v. *Munger*, 95 Fed. Rep. 87, 95.

This is not to say that a bank undertakes to supervise and safeguard a trust account therein, or comes under the duty of looking after the appropriation of such funds when withdrawn. Such is not the law. *Gray* v. *Johnston*, L. R. 3 H. L. Cas. 1, 14; *Goodwin* v. *American National Bank*, 48 Conn. 550, 565. Neither is it to say that a bank is not entitled, at least in the absence of knowledge to the contrary, to presume that a depositor who presents a check in proper form is acting in the course of a lawful exercise of his rights, or that suspicion on its part that an improper use of the proceeds of a check regularly drawn and presented was intended to be made by the drawer of it would justify a refusal to honor it, or that the existence of such a suspicion, or reasonable grounds therefor, would cast upon a bank a duty to investigate as to the correctness of that suspicion. The authorities are to the contrary. *National Bank* v. *Insurance Co.*, 104 U. S. 54, 63; *Goodwin* v. *American National Bank*, 48 Conn. 550, 567; *Walker* v. *Manhattan Bank*, 25 Fed. Rep. 247, 255; *Duckett* v. *Mechanics Bank*, 86 Md. 400, 405, 38 Atl. 983. Neither is it to say that a bank would not be protected in honoring a check regularly drawn and presented by a custodian of trust or other funds not his own, even though it had actual knowledge that such custodian was misappropriating such funds, or that it was not bound to honor it. The authorities are not uniform upon this subject. *National Bank* v. *Insurance Co.*, 104 U. S. 54, 63; *Gray* v. *Johnston*, L. R. 3 H. L. Cas. 1, 14; *Duckett* v. *Mechanics Bank*, 86 Md. 400, 405, 38 Atl. 983. We have no occasion to pass upon the questions involved, and may well assume, without decision, the correctness of the broad proposition of the most numerous authorities, that it would be protected in so doing. But a bank may not actively and knowingly participate in a misappropriation of trust funds. It may not become an active co-operating agency to that end, and by such co-operation directly contribute to the consum-

mation of the wrong.  *Bank of New Milford* v. *New Milford*, 36 Conn. 93, 101; *Smith* v. *Anderson*, 57 Hun (N. Y.) 72, 74, 10 N. Y. Supp. 278; 1 Morse on Banks & Banking (4th Ed.) § 317.  Here lies the defendant's shortcoming.  It did something more than passively honor checks duly presented whose proceeds it knew were to be used for a purpose in violation of the trust attached to them. In the ways indicated it lent itself as an active instrument in the fraud accomplished, and potently contributed to the accomplishment of it, so that it will not be held free from responsibility for it.  These two checks cannot, therefore, be charged against the account upon which they were drawn.

April 10th, 1906, Layton, who already had an account with the bank in his own name, opened another under the name of "Jacob M. Layton Special Account."  This was, and was known to be, his personal account also.  On April 24th and May 2d, 1906, he drew four checks against it, payable to the order of one Reed, who was in some way concerned with the interests of said Foundry Company, signed them "Jacob M. Layton Special Account," as cashier certified them payable at the Hanover National Bank, New York, and issued them.  The Hanover Bank paid them upon presentation and charged the amounts thereof to the defendant, and the same were allowed in the settlements of account between the banks.  At the time these checks were drawn and certified there were not sufficient funds in the special account to meet them, and they constituted an overdraft of that account to the amount of $13,000.  To remedy the shortage thus created, and to provide sufficient funds in the account to meet these checks when presented, Layton, on May 3d, 4th and 19th, 1906, drew five checks against the estate's account, amounting in all to $14,157.14, and caused them to be credited to said special account.  These checks were all drawn to the order of Layton, administrator, and indorsed by him in that

capacity. The amounts thus transferred were subsequently used to take up said certified checks. The court held that the bank benefited by these transactions to the extent of the overdraft of $13,000, which was made good by them, and included that sum in its judgment.

The defendant contends that the finding that it was benefited as stated is not justified, for the reason that Layton, cashier, could not lawfully certify his own check, and thereby obligate the bank, and that the Hanover Bank took the checks with knowledge of this infirmity apparent upon their face. It has been decided that the general rule of law is as stated; *Claflin* v. *Farmers & Citizens Bank*, 25 N. Y. 293; but it does not follow that the directions of this defendant to the Hanover Bank, its correspondent, were not such, or the course of dealing between the two banks such, that the apparent obligation assumed by the certification was not a real one. Indeed, the exhibits in this case incidentally disclose the suggestive fact that precisely similar checks had been previously given to the same payee, similarly certified, paid by the Hanover Bank, and accounted for by the defendant. But however successful the defendant might ultimately prove to be in defending a claim made upon these certifications, or in a resort to Layton, it is quite certain that a provision of funds in the "special account" sufficient to meet the certified checks as they were presented, and thus avoid the necessity of its resorting to either of these expedients to save itself from loss, would be distinctly beneficial to it. But the factor of benefit aside, the defendant will not be permitted to avail itself of these attempted transfers of funds from the deposit of the estate to the private account of Layton, and his appropriation of them to his private uses, for the reasons hereinbefore stated as applicable to the amount of the two checks.

December 29th, 1905, Layton drew a check upon the account of the estate in the defendant bank for the sum of

$10,000, payable to the Yale National Bank of New Haven,
and obtained therefor from the last named bank a certifi-
cate of deposit for that sum.  May 7th, 1906, he indorsed
the certificate and deposited it, together with the accrued
interest therein, in said "special account."  The amount of
the certificate and interest, to wit, $10,140, was in due
course paid into the defendant bank.  Between May 7th
and June 11th, 1906, Layton drew checks against the
"special account" by which the whole amount of the cer-
tificate and interest was appropriated to his own uses.
It does not appear in whose name the certificate was
issued.  It is scarcely to be believed that the depositary,
having received a check purporting to be drawn upon the
funds of an estate, would issue therefor a certificate indi-
cating any other ownership; but the finding does not fur-
nish definite information.  In the absence of this informa-
tion nothing appears upon the record which would indicate
to the officers of the bank, other than Layton, that the
funds represented by the certificate were the property of
the Lowndes' estate.  But Layton did know.  He knew
the ownership of the funds when they passed into the hands
of the bank, during all the time that they remained there,
and when they were being paid out.  Whatever knowledge
he had in that respect, although acquired in his individual
capacity, he under the circumstances of this case carried
over with him into the exercise of his duties and powers as
cashier.  He carried it with him into every transaction in
which the bank participated through him.  *In re Carew's
Estate*, 31 Beav. 39, 46; *New York & N. H. R. Co.* v. *Schuy-
ler*, 34 N. Y. 30, 84; *Holden* v. *New York & Erie Bank*, 72
id. 286; *Loring* v. *Brodie*, 134 Mass. 453, 458.  This knowl-
edge being thus supplied, we have a situation precisely
similar to that already discussed, with the result that the
court was in error in not embracing this amount of $10,140
in its judgment.

June 24th, 1906, Layton drew a check for $2,000, paya-

ble to himself, upon the estate's account, and the amount thereof was paid to him. The purposes for which the money was used are unknown. It does not appear that any of this money was misappropriated, and it was not the duty of the bank to see that it was rightfully appropriated. The check from Layton, administrator, to Layton individually, was not irregular upon its face. *Goodwin* v. *American National Bank,* 48 Conn. 550, 567. The court was right in declining to include this sum in its judgment.

The court was correct in allowing the plaintiffs interest from the date of the demand, which is found to have been made for the amount which was due the estate on September 11th, 1906. From that time the defendant held the money now recovered in denial of the plaintiffs' right to it. *Selleck* v. *French,* 1 Conn. 32, 33.

Two rulings upon the admission of testimony are claimed to have been erroneous. Both concerned matters not material to our conclusions, and were harmless even if incorrect.

There is error upon the plaintiffs' appeal, and no error upon the defendant's. The judgment is set aside, and the cause remanded for the rendition of a judgment in favor of the plaintiffs for the principal sum of $56,140, together with interest thereon from September 11th, 1906, to the date of judgment.

In this opinion the other judges concurred.